UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  3/21/2023
```

GEORGE RIVERA,

                          Plaintiff,

        -against-

GREATER HUDSON VALLERY HEALTH
SYSTEM (NOW KNOWN AS GARNET
HEALTH) ("GHVHS"), ORANGER REGIONAL
MEDICAL CENTER ("ORMC"), TRISH MANNA,
in her corporate capacity as GHVHS Director of
Compliance, Audit & HIPAA Privacy and in her
individual capacity, STEPHEN SUGRUE, in his
corporate capacity as then GHVHS VP of
compliance, Audit & Real Estate and in his
individual capacity, JOANNE STURANS, in her
corporate capacity as GHVHS Chief Human
Resources Officer and in her individual capacity,
LAUREN CARBERRY, in her corporate capacity as
ORMC's Director of Employee & Labor Relations
and in her individual capacity, and GREGG
HOUGH, in his corporate capacity as GHVHS-
ORMC Director of Safety Security & Emergency
Management and in his individual capacity,

                          Defendants.

No. 21-cv-1324 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

        Plaintiff George Rivera ("Plaintiff") initiated this action on February 15, 2021 against

defendants Greater Hudson Valley Health System (now known as Garnet Health) ("GHVHS");

Orange Regional Medical Center ("ORMC"); Trish Manna, in her corporate capacity as GHVHS

Director of Compliance, Audit & HIPAA Privacy and in her individual capacity; Stephen Sugrue,

in his corporate capacity as GHVHS Vice President of Compliance, Audit & Real Estate and in

his individual capacity; Joanne Huber Sturans, in her corporate capacity as GHVHS Chief Human

Resources Officer and in her individual capacity; Lauren Carberry, in her corporate capacity as ORMC's Director of Employee & Labor Relations and in her individual capacity; and Gregg Hough, in his corporate capacity as GHVHS-ORMC Director of Safety Security & Emergency Management and in his individual capacity (collectively, "Defendants").[1]   (ECF No. 1 ("Complaint")).

Plaintiff alleges that: (a) his employer, GHVHS, unlawfully discriminated against him on the basis of his age and race/national origin in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,* the New York State Human Rights Law, N.Y. Exec. Law § 290 *et seq.* ("NYSHRL"), and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*; (b) each of the named individual Defendants aided and abetted, condoned, ratified, and/or directly participated in said discrimination, and (c) each of the Defendants retaliated against plaintiff for reporting that discrimination.  (ECF No. 47 ("Pl.'s Opp.") at 1.)

Presently before the Court is Defendants' motion for summary judgment on all claims under Federal Rule of Civil Procedure 56 (ECF No. 41, the "Motion").  For the following reasons, the motion for summary judgment is GRANTED.

## BACKGROUND

The facts below are taken from the parties' Rule 56.1 statements, affidavits, declarations, and exhibits, and are not in dispute except where so noted. All rational inferences are drawn in Plaintiff's favor.

---

[1]     In his opposition, Plaintiff concedes that Defendants Sugrue and Carberry were not properly served with the Complaint and states that the claims against those defendants should be dismissed *with prejudice*. Plaintiff also withdraws his claims against Defendant Manna *with prejudice*.  (*See* Pl.'s Opp. at 21 n.3.)

I.    **Factual Allegations**

A.  **Plaintiff's Role as Armed Security Guard for Orange Regional Medical Center**

Plaintiff, a Hispanic man of Puerto Rican origin, was hired by Garnet Health Medical Center ("GHVHS") to be an Armed Security Guard for one of its branches, Orange Regional Medical Center ("ORMC"), and began working on August 11, 2014.  (ECF No. 46 ("Pl.'s 56.1") ¶¶ 12, 14.)  Plaintiff was around 59 years old when he was hired. (*Id.* ¶ 11.)

Gregg Hough ("Mr. Hough"), a Caucasian man, was also hired to be an Armed Security Guard at ORMC at the same time.  (ECF No. 43 ("Defs.' 56.1") ¶¶ 15, 16.)  Plaintiff and Mr. Hough went through orientation together, but did not work the same shift, so they had little contact until Mr. Hough was promoted to Security Manager in 2015, at which time he became Plaintiff's supervisor. (Defs.' 56.1 ¶¶ 21, 26.)  Mr. Hough was aware that Plaintiff was Hispanic.  (*Id.* ¶ 22.)

From 2014 to 2017, while Plaintiff was employed as an Armed Security Officer, there were no instances where anyone was critical of his job performance.  (*Id.* ¶ 24.)  In 2016, Mr. Hough conducted a performance review of Plaintiff and gave him an overall rating of "Meets Plus" and wrote that Plaintiff had "leadership qualities and would be a good mentor for many of the newer members of the team."  (*Id.* 1 ¶ 27.)  For the time period of August 2015 to August 2016, Plaintiff received an overall rating of "Meets Plus" from Mr. Hough, who also recommended that Plaintiff pursue greater responsibilities at GHVHS.  (*Id.* ¶ 28.).

B.  **Plaintiff's Promotion to Emergency Management and Safety Manager**

In or about 2017, Miguel Rodrigues (Director of Security, Emergency Management and Safety) reached out to Plaintiff and asked him whether he would be interested in a management position at Catskill Regional Medical Center ("Catskill"), another branch of GHVHS.  (*Id.* ¶ 30.)  Plaintiff expressed interest in the position and was interviewed by Mr. Rodrigues, who then

3

informed him that he had been selected for the promotion.  (*Id.* ¶ 30.)  On January 9, 2017, Mr. Rodrigues sent a memo to all GHVHS employees announcing that Plaintiff was appointed to the position of Emergency Management and Safety Manager. (*Id.* ¶ 34.)  In this position, Plaintiff was responsible for coordinating emergency management and safety policies within Catskill.  (*Id.* ¶ 34.)  When the Security Manager at Catskill left the position, Plaintiff assumed that role as well, supervising the Security Officers and doing their scheduling and payroll. (*Id.* ¶ 34.)  Plaintiff was about 62 years old at the time that he was promoted to Emergency Management and Safety Manger.  (*Id.* ¶ 32.)

On July 2, 2017, Mr. Rodrigues gave Plaintiff a probationary performance review rating of "Meets" (*Id.* ¶ 36).

### C.  Plaintiff's Transfer to ORMC as Manager of Security

Sometime in 2018, Plaintiff had a meeting with Stephen Sugrue, Vice President of Support Services and Real Estate, and Richard Carey, Administrator of Facilities.  (*Id.* ¶ 37.)  During this meeting, Plaintiff was informed that he was going to be moved back to ORMC as the Manager of Security.  (*Id.* ¶ 37.)  Plaintiff was 63 years old when he was transferred to ORMC and promoted as Manager of Security.  (*Id.* ¶ 38.)[2]

Both Mr. Rodrigues and Mr. Hough were given new assignments and promotions by Mr. Sugrue and Mr. Carey.  (*Id.* ¶ 41.)  Mr. Rodrigues became the Director of Emergency Management at Catskill. Mr. Hough was promoted to the Director of Security at ORMC.  (*Id.*)

As the Manager of Security, Plaintiff was responsible for supervising security officers and overseeing their schedules, payroll, administering discipline, handling grievance complaints, and investigating compliance issues. (*Id.* ¶ 42.)  Plaintiff was also responsible for reporting any such

---

[2]  The parties dispute whether Mr. Hough was involved in the decision to transfer Plaintiff back to ORMC and promote him to Manager of Security.  (Defs.' 56.1 ¶ 40).

investigations to Mr. Hough.  (*Id.*)   In April 2018, Plaintiff was informed by Mr. Hough that his title would be changing to Manager of Security and Courier Services at ORMC.  Plaintiff's annual pay remained the same.  (*Id.* ¶ 43.)

As Manager of Security and Courier Services, Plaintiff's essential function was to provide a safe and secure environment for patients, visitors, physicians and employees at GHVHS and ensure the availability of competent, trained security staff twenty-four hours a day.  (*Id.* ¶ 44.) Some of his responsibilities included: (1) selecting, training, and developing staff for continuity of service; (2) overseeing the investigation of incidents, accidents, and other events involving staff, patients or visitors and preparing concise reports of same for the Director of Security; and (3) assuring by audit that all staff were adequately working.  (*Id.* ¶ 44.)

Plaintiff testified that as a manager, he not only had to follow the policies reviewed during ORMC's Security Department Orientation, but also had to enforce those policies with the employees he was managing, which included disciplining security officers and investigating compliance issues.  (*Id.* ¶ 45.)

During Plaintiff's employment at ORMC, he was aware of ORMC Security Department's Call Out Policy.  (*Id.* ¶ 46.)   However, Plaintiff did not believe the Call Out Policy applied to him after he became a manager and testified that he was only required to call in to the Director of Security to request days off.  (*Id.*)

While he was the Manager of Security and Courier Services, Plaintiff received an annual Performance Evaluation for 2018 on March 6, 2019.  (*Id.* ¶ 47.)  The 2018 Performance Evaluation Summary Form was completed by Mr. Hough, who gave Plaintiff an overall performance rating of "Exceeds Expectations."  (*Id.*)   Nonetheless, at his deposition, Mr. Hough testified that he encountered at least two issues as to Plaintiff's performance.   In September 2018, Plaintiff

allegedly failed to properly inspect a former employee for a firearm in contravention of Mr. Hough's and Ms. Joanne Huber Sturans' ("Ms. Sturans") directives.  (*Id.* ¶ 50.)  Mr. Hough counseled Plaintiff but did not write him up because he wanted to maintain a working relationship with him.  (*Id.*)  In addition, in October 2018, Plaintiff also allegedly failed to notify Mr. Hough about a security incident involving a doctor who threatened to kill his child.  (*Id.*)  Plaintiff disputes these allegations made by Mr. Hough, stating that there is no evidence corroborating those alleged occurrences.  (Pl.'s 56.1 ¶ 50.)

### D.  January 2019 Meeting with Supervisors

On January 6, 2019, Plaintiff had a meeting with Mr. Hough, Mr. Sugrue, and Mr. Carey. (Defs.' 56.1 ¶ 51.)  The parties dispute as to what was communicated to Plaintiff at this meeting. Plaintiff testified that Mr. Hough only him that "I want you to be a manager, not a part of the boy's club," but that nothing was said at this meeting regarding Plaintiff's callouts or working schedule. (Pl.'s 56.1 ¶ 52.)  Defendants, however, aver that Mr. Hough raised issues about Plaintiff's performance, such as his issues with communication, attendance and participation at trainings, and excessive call outs, as well as how Plaintiff needed to address policy violations and be more hands-on with discipline of Security Officers.  (Defs.' 56.1 ¶ 52.)

Plaintiff testified that during this meeting, Mr. Hough suggested that he "go after Mr. Grimm [a security officer] because he's older, he is not competent, and he has to go." (*Id.* ¶ 53.) Plaintiff further testified that Mr. Hough stated that Mr. Grimm was a hazard and was endangering others because of his age and because he could not see or hear clearly.  (*Id.* ¶ 53.) Mr. Hough,

however, testified that he ever told anyone to target Mr. Grimm due to him being slow and older. (*Id.* ¶ 55.)

Following the meeting, Plaintiff approached Mr. Hough to apologize about his demeanor during the meeting and expressed an interest in behaving more like a manager, which Mr. Hough interpreted as indicating a fresh start for 2019.  (*Id.* ¶ 58.)

### E.  Hiring Mollie Kennedy as Security Secretary

In February 2019, GHVHS hired Mollie Kennedy, a Caucasian woman in her late twenties or thirties, as a Security Secretary.  (*Id.* ¶¶ 60–61.)  Mr. Hough expressed to Plaintiff that he was seeking to hire a Security Secretary who could take over some of Plaintiff's job duties so Plaintiff "could have a little time for [him]self because [he] was looking a little tired." (*Id.* ¶ 62.)  A month after Ms. Kennedy began working, she assumed scheduling responsibilities, though Plaintiff retained supervision over changes in schedule, which had to be approved by him.  (*Id.* ¶¶ 63–64.)

Defendants aver that Ms. Kennedy complained to Mr. Hough that Plaintiff left on a two-week vacation without completing a schedule, and Plaintiff subsequently sent out a schedule riddled with errors.  (*Id.* ¶ 65.)  Plaintiff, on the other hand, states that he only possessed approval power over the schedule, that schedule completion was done by Ms. Kennedy, and that callouts were directed to Ms. Kennedy and not relayed to Plaintiff.  (Pl.'s 56.1 ¶ 65.)

### F.  Plaintiff's May 2019 Complaint and Promotion

In May of 2019, Plaintiff called Ms. Sturans, Chief Human Resources Officer, about an issue he wanted to discuss.  (Defs.' 56.1 ¶ 66.) Plaintiff and Ms. Sturans met that same day in her office at ORMC.  (*Id.* ¶ 66.)  During this meeting, Plaintiff expressed his concern about the reassignment of scheduling to Ms. Kennedy. (*Id.* ¶ 68.)  Plaintiff also believed that Mr. Hough had spoken to him harshly.  (*Id.*)  Plaintiff stated to Ms. Sturans that Mr. Hough seemed impatient with

him, but did not provide Ms. Sturans with any specific examples of problematic behaviors by Mr. Hough. (*Id.*) The parties dispute whether Plaintiff informed Ms. Sturans that he felt he was being discriminated against because of his age and his race because Mr. Hough wanted to bring in a younger person to take on scheduling, which accounted for half of his daily responsibilities. (Pl.'s 56.1 ¶ 69.) Ms. Sturans made Mr. Hough aware of Plaintiff's complaint and indicated that both should work on their relationship. (Defs.' 56.1 ¶ 71.)

Ms. Sturans had a second meeting with Plaintiff and Mr. Sugrue about his May 2019 complaint on June 25, 2019. (*Id.* ¶ 72.) Ms. Sturans' had conducted an investigation regarding Plaintiff's allegations, and she discovered that there was a need to restructure the security team due to confusion about roles and responsibilities. (*Id.* ¶ 73.) Ms. Sturans explained to Plaintiff that regarding the reassignment of scheduling to Ms. Kennedy, Ms. Kennedy only assumed administrative or clerical duties, and that Plaintiff retained oversight and decision-making over scheduling. (*Id.* ¶ 73.) Ms. Sturans also indicated that she and her team would be working with the Security Department as a whole to enhance communication methods. (*Id.* ¶ 74.) Plaintiff testified that at this meeting, Ms. Sturans asked if Plaintiff wanted to be demoted back as an Armed Guard, which he refused. (Pl.'s 56.1 ¶ 74.) At the same time, Plaintiff was informed that his responsibilities as Manager of Security would be expanded to include all of GHVHS, not just ORMC. (Defs.' 56.1 ¶ 75.) Plaintiff's hourly rate increased to $34.69 as a result of his increased job responsibilities. (*Id.* ¶ 76.) Plaintiff was 64 years old at the time of this promotion. (*Id.* ¶ 77.)

The content of the meeting was memorialized in a letter, dated June 25, 2019.  (*See* ECF No. 44 (Joseph A. Saccomano Affirmation or "JAS Aff."), Exh. 21.)

Around that time, Mr. Hough became the Director of Security for GHVHS in June 2019 as part of the change to leadership structure.  (*Id.* ¶ 78.)

### G.  Plaintiff's Performance as Manager of Security at GHVHS

The parties dispute the circumstances surrounding a security breach incident, where a former employee entered ORMC to deliver a cake to the CEO sometime in July 2019 even though the employee did not know the CEO and did not have an appointment.  (*Id.* ¶ 80; Pl.'s 56.1 ¶ 80.) Defendants aver that Plaintiff did not notify Mr. Hough about the incident even though Mr. Hough made it clear that he wanted to be informed of such incidents.  (Defs. 56.1 ¶ 80.)  Plaintiff testified that he was not made aware of this incident while it was occurring nor from a report by his security guards after the fact, and instead, he found out about the incident from a front desk receptionist the next day.  (Pl.'s 56.1 ¶ 80.) Plaintiff testified that he looked into the incident, and it was not suspicious because that same visitor frequently would go beyond the lobby to visit her mother in the hospital.  (*Id.*)

On August 5, 2019, Plaintiff had a meeting with Mr. Hough, Mr. Sugrue, and Mary Jo Levins, Human Resources Partner, in Mr. Sugrue's office to discuss Plaintiff's performance.  (Pl.'s 56.1 ¶ 81.)  During this meeting, Plaintiff stated that he felt he was being targeted by Mr. Hough due to his May 2019 complaint made to Ms. Sturans.  (Defs.' 56.1 ¶ 82.)  Mr. Hough stated that Plaintiff was taking off too many Fridays.  (*Id.* ¶ 83.)  Plaintiff replied that he would come in on Sundays to do payroll.  (*Id.*)  In response to this discussion about Plaintiff's call outs, Mr. Sugrue stated that everyone had to abide by the same rules.  (*Id.*)  Mr. Sugrue also offered Plaintiff the opportunity to return to an Armed Security Officer position, which Plaintiff rejected.  (*Id.*)  During

this meeting, Mr. Hough also discussed Plaintiff's failure to hold officers accountable for their work responsibilities, including Plaintiff's refusal to write up security officers despite Mr. Hough directing him to do so.  (*Id.* ¶ 84.)

On September 12, 2019, Mr. Hough gave Plaintiff a Formal Follow Up Memo, copying Mr. Sugrue and Ms. Levins, regarding the August 5, 2019 meeting.  (*Id.* ¶ 88; JAS Aff., Exh. 23.) In the memo, Mr. Hough explained that "[i]n efforts to support [Plaintiff's] success we have incorporated weekly one-on-one meetings to increase communication between us and coach [Plaintiff] through obstacles you encounter."  (*Id.*; JAS Aff., Exh. 23.)  After the August 5, 2019 meeting, Mr. Hough and Ms. Levins met with Plaintiff on August 14, August 22, and September. (*Id.* ¶ 89.)  The memo also indicated that Plaintiff needed to work on: (1) addressing policy violations immediately and thoroughly as well as communicating those violations with leadership; (2) conducting timely investigations with all staff and witnesses involved within the Security department or hospital wide; (3) documenting findings from investigation meetings and provide a close out document to all involved; (4) maintaining Security Department policies of ORMC and CRMC; (5) completing all Security Staff evaluations in the same month that they are scheduled; (6) attending hospital meetings; (7) improving his attendance at work." (*Id.* ¶ 90; JAS Aff., Exh. 23.)  Plaintiff contests all of these findings indicated in the memorandum.  (Pl.'s 56.1 ¶¶ 90–94.)

On September 25, 2019, Mr. Hough met with Plaintiff, where Mr. Hough discussed several areas of deficiency in Plaintiff's job performance, including continued issues with conducting investigations, insubordination, and excessive absences.  (ECF No. 43 ("Defs.' 56.1") ¶ 97.)  Mr. Hough sent an email to Mr. Sugrue and Ms. Levins on September 27, 2019 recapping his meeting

with Plaintiff and recommending that Plaintiff be issued a Corrective Action and be placed on a ninety-day Performance Improvement Plan ("PIP").  (*Id.* ¶ 97; JAS Aff., Exh. 31.)

On October 7, 2019, Mr. Hough issued a Verbal Warning in the form of a Corrective Action Record ("CAR") to Plaintiff for failure to adhere to and meet ORMC's attendance standard. (Defs.' 56.1 ¶ 98; JAS Aff., Exh. 24.)  The Verbal Warning also indicated that Plaintiff was given prior warnings in January 2019 and August 2019.  (Defs.' 56.1 ¶ 99; JAS Aff., Exh. 24.)  Plaintiff did not sign the Verbal Warning. (Defs.' 56.1 ¶ 101; JAS Aff., Exh. 24.)

### H.  Improper ID Badge Use Incident on October 7, 2019

On October 7, 2019, Plaintiff reported via email to Mr. Hough that he received a call from a Mayra Aguilar, a contractor of ORMC.  (Defs.' 56.1 ¶ 102.)  Ms. Aguilar informed Plaintiff that someone was using her ID badge to enter and work at the hospital.  (*Id.*)  On October 9, 2019, Plaintiff followed up with Mr. Hough and informed him that Ms. Aguilar's ID was disabled the moment the complaint was received. (*Id.* ¶ 103.)  Plaintiff did not know the identity of the person who used Ms. Aguilar's ID badge.  (*Id.*)  On October 10, 2019, Mr. Hough replied that the person using Ms. Aguilar's ID badge had been identified and the ID badge was returned and disposed of by Mr. Hough, who also informed Plaintiff that Aguilar's employer would be instructing their staff about proper use of GHVHS' ID badge policy.  (*Id.* ¶ 104.)

### I.  October 18, 2019 Verbal Warning and PIP

On October 18, 2019, Mr. Hough issued another Verbal Warning in the form of a CAR to Plaintiff for violation of the Standards of Performance and Behavior Policy.  (*Id.* ¶ 105; JAS Aff. Exh. 26.)    The Verbal Warning emphasized areas in Plaintiff's performance that required immediate and sustained improvement, which included: (1) authorizing/approving days off for employees while ensuring there is proper coverage and safe staffing levels; (2) approving the

schedule within 48 hours of receipt from the Security Safety Emergency Management Assistant and addressing scheduling issues with officers; (3) attending NEO presentations as needed; (4) conducting timely and thorough investigations that are assigned and communicating follow-up to Mr. Hough and issuing close-out documents to employees; and (5) managing and monitoring the time and attendance of direct reports and following-up with disciplines if applicable.  (Defs.' 56.1 ¶ 106; JAS Aff. Exh. 26.)

At this same meeting, Plaintiff was also placed on a PIP.  (Defs.' 56.1 ¶ 106.)  The PIP listed several areas where Plaintiff needed improvement, which included: (1) effective communication; (2) administrative supervision of the department schedule; (3) investigations and follow-up; (4) timely submissions of evaluations; (5) proficiency with CRMC camera and computer systems; and (5) attendance. (Defs.' 56.1 ¶ 106; JAS Aff. Exh. 26.) The PIP also provided that "[f]ailure to meet any portion of this improvement plan at any time during the ninety (90) day period may result in corrective action up to and including termination."  (Defs.' 56.1 ¶ 106; JAS Aff. Exh. 26.)  Plaintiff signed the PIP.  (Defs.' 56.1 ¶ 106; JAS Aff. Exh. 26.)

### J.  Plaintiff's October 31, 2019 Email to Ms. Manna

On October 31, 2019, Plaintiff emailed Trish Manna, Corporate Compliance Officer and Director of Audit and HIPAA Privacy, where he wrote that he "reported a grievous security breach perpetrated by a vendor and the cover-up that followed orchestrated by the Directors of Security, EVS and the owner of the contracted company." (Defs.' 56.1 ¶ 106; JAS Aff., Exh. 27.)  Plaintiff wrote that after his report, he received a "frivolous" PIP and CAR from the Director of Security, and that "[i]f this is not retaliation and harassment I don't know what is."  (Defs.' 56.1 ¶ 106; JAS Aff., Exh. 27.)  That same day, Ms. Manna emailed Plaintiff in response stating, "[a]s a follow-up to the conversation that Ann Marie and I had with you, these are two separate concerns. Your

anonymity will be maintained regarding the issue of the vendor and the employee badge. The compliance office is currently conducting an internal audit of the vendor management process." (Defs.' 56.1 ¶ 114; JAS Aff., Exh. 27.)  Following Plaintiff's email, Ms. Manna conducted an investigation of the vendor to see if there were any violations. (Defs.' 56.1 ¶ 117).  Ms. Manna spoke to the owner of the vendor and spoke to the Ms. Levins to see if anyone had anonymously reported a potential vendor violation. (*Id.* ¶ 117.)  Ms. Levins informed Ms. Manna that Mr. Hough had already reported the incident. (*Id.* ¶ 117.)

### K.  November 25, 2019 Written Warning

On November 25, 2019, Plaintiff was given a Written Warning for failure to meet the requirements of his job duties and the goals set forth in his October 18, 2019 PIP.  Plaintiff was also provided with a 30-day assessment of his progress pursuant to the PIP. (Defs.' 56.1 ¶ 119; JAS Aff., Exh. 28.)  Plaintiff contests the veracity of the findings in the written warning. (Pl.'s 56.1 ¶¶ 120–22.)  Plaintiff did not sign the written warning. (Defs.' 56.1 ¶ 123.)

### L.  Plaintiff's November 29, 2019 Email to Lauren Carberry

On November 29, 2019, Plaintiff sent an email to Lauren Carberry, Director of Employee and Labor Relations, complaining that Mr. Hough's "retaliation for my reporting the fraudulent use of ORMC IDs scandal and its cover-up continues and actually has intensified since my sending the October 31st email to Compliance / Human Resources." (Defs.' 56.1 ¶ 125; Exh. 32.)  Plaintiff wrote that he believed Mr. Hough began to treat him differently after he complained in May 2019 to Ms. Sturans about Mr. Hough giving his scheduling duties to Ms. Kennedy. (Defs.' 56.1 ¶ 125; Exh. 32.)  Plaintiff also wrote that he believed Mr. Hough engaged in age discrimination by reassigning the scheduling duties to Ms. Kennedy and telling Plaintiff to target Mr. Grimm. (Defs.' 56.1 ¶ 125; JAS Aff., Exh. 32.)  Plaintiff requested that the PIP and CARs be removed from his

13

record and that Human Resources "investigate Gregg Hough's unlawful retaliation against me for reporting the fraudulent use of ORMC IDs, security breach and its cover-up, the violation of the NYS Whistleblower Law and the acts of age discrimination." (Defs.' 56.1 ¶ 125; JAS Aff., Exh. 32.) Plaintiff and Ms. Carberry had an in-person meeting in Plaintiff's office that day to discuss the allegations in his email, and Ms. Carberry informed Plaintiff that she would investigate his complaint. (Defs.' 56.1 ¶ 127.)

### M. The January 20, 2020 Memorandum

On January 20, 2020, Plaintiff received a memo from Ms. Carberry, which served as a formal follow-up to Plaintiff's allegation of discrimination. (Defs.' 56.1 ¶ 131; JAS Aff., Exh. 33.) Ms. Carberry's memo outlined each of Plaintiff's concerns. In response to Plaintiff's allegations that the reassignment of the scheduling duties to Ms. Kennedy was a result of age discrimination, Ms. Carberry explained that this reassignment was done to allow Plaintiff to focus more on employee and investigation concerns. (Defs.' 56.1 ¶ 131; JAS Aff., Exh. 33.) Regarding the contractor's ID badge issue, Ms. Carberry explained that a full review of contracted employee on-boarding was done as a result of Plaintiff's complaint and there was no finding of deliberate misuse. (Defs.' 56.1 ¶ 131; JAS Aff., Exh. 33.) As to Plaintiff's allegation that Mr. Hough began to target him following his October 31, 2019 email to Ms. Manna, Ms. Carberry indicated that she was made aware that Plaintiff had numerous direct discussions with his supervisors about his performance issues prior to him sending the October 31, 2019 email. (Defs.' 56.1 ¶ 131; JAS

Aff., Exh. 33.)  Ms. Carberry briefly summarized the content of each of those discussions or letters memorializing those discussions.  (JAS Aff., Exh. 33.)

### N.  The January 24, 2020 Final Written Warning In Lieu of Suspension

On January 24, 2020, Plaintiff received a Final Written Warning In Lieu of Suspension for failure to meet the expectations laid out in his October 18, 2019 PIP.  (Defs.' 56.1 ¶ 132; JAS Aff., Exh. 34.)  Plaintiff testified that he did everything required of him to fulfill the PIP requirements, and he refused to sign the final written warning.   (Pl.'s 56.1 ¶ 132–33.)

Plaintiff was called into a meeting on January 30, 2020, where he was presented with a termination letter for failure to meet expectations set forth in the PIP.  (Defs.' 56.1 ¶ 134.)  Plaintiff refused to sign the termination letter.  (Defs.' 56.1 ¶ 134; JAS Aff. Exh. 35.)  Plaintiff was replaced by Greg Mills, a Caucasian male of sixty-three years of age.  (Defs.' 56.1 ¶ 136.)

## II.    Procedural Background

Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission (the "EEOC") on March 6, 2020.  (Defs.' 56.1 ¶ 144; JAS Aff., Exh. 36).  The EEOC issued a Notice of Dismissal and Notice of Right to Sue on November 16, 2020.  (Defs.' 56.1 ¶ 145; JAS Aff., Exh. 37).

Plaintiff commenced this action on February 15, 2021.  (ECF No. 1.)  Defendants filed an answer to the complaint on May 26, 2021 (ECF No. 21.)  The parties filed a civil case discovery plan on March 9, 2022 (ECF No. 30), and an order of reference to Magistrate Judge Paul E. Davison was issued that same day.  (ECF No. 31.)

On May 6, 2022, following the completion of discovery, the Court granted Defendants' request for leave to file the instant motion for summary judgment.  (ECF No. 37.)  The parties completed briefing on July 29, 2022.  (ECF No. 41.)

## STANDARD OF REVIEW

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents . . . [and] affidavits or declarations," *see* Fed. R. Civ. P. 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party may support an assertion that there is no genuine dispute of a particular fact by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).  If the moving party fulfills its preliminary burden, the onus shifts to the nonmoving party to raise the existence of a genuine issue of material fact.  Fed. R. Civ. P. 56(c)(1)(A); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; a*ccord Gen. Star Nat'l Ins. Co. v. Universal Fabricators, Inc.*, 585 F.3d 662, 669 (2d Cir. 2009); *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008); *Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013) (summary order).  Courts must "draw all rational inferences in the non-movant's favor," while reviewing the record.  *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 224 (2d Cir. 2014) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  Importantly, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," nor is it to determine a witness's credibility.  *Anderson*, 477 U.S. at 249; *see also Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010).  Rather, "the inquiry performed is the threshold inquiry of determining whether there is the need for a trial." *Anderson*, 477 U.S. at 250.  Summary judgment should be

granted when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

Critically, in an opposition to a motion for summary judgment "[s]tatements that are devoid of any specifics, but replete with conclusions" will not suffice. *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation") (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)).

## DISCUSSION

The Complaint contains three causes of action, all of which are at issue on the motion for summary judgment. *First*, Plaintiff asserts a claim for discrimination on the basis of race and national origin, in violation of Title VII, against all Defendants. (Compl. ¶¶ 47–48.) *Second*, Plaintiff asserts a claim for discrimination on the basis of his age, in violation of the ADEA, against all Defendants. (Compl. ¶¶ 49–50.) *Lastly*, Plaintiff asserts a claim against all Defendants for discrimination on the basis of his race, national origin, and/or age in violation of the NYSHRL. (Compl. ¶¶ 51–52.)

For the reasons stated below, the Court GRANTS summary judgment on all claims

## I.   Individual Defendants' Liability in their Individual and Official Capacities

Before reaching the substance of Plaintiff's claims, the Court notes that "[n]either the ADEA nor Title VII allows for imposition of personal liability on the part of an individual, employee or supervisor." *See Mabry v. Neighborhood Defender Service*, 769 F. Supp. 2d 381, 391 (S.D.N.Y. 2011) (citing *Wrighten v. Glowski*, 232 F.3d 119, 120 (2d Cir. 2000)) (holding that

individual defendants may not be personally liable under Title VIII); *Parker v. Metro. Transp. Auth.*, 97 F. Supp. 2d 437, 452 (S.D.N.Y. 2000) (holding that an individual defendant may not be liable under the ADEA).

While the Second Circuit has yet to address whether plaintiffs may assert claims under Title VII or the ADEA against individuals in their official capacities, many courts within this Circuit (including this one) have disallowed claims against non-employer individuals sued in their official capacities because such claims are duplicative of claims against a corporate defendant. *See, e.g., Garcia v. Yonkers Bd. of Educ.*, No. 15 Civ. 767 (NSR), 2016 WL 3064116, at *4 (S.D.N.Y. May 27, 2016) ("Plaintiff cannot assert any Title VII retaliation claims against the Individual Defendants, even in their official capacities, and all such claims are dismissed."); *Harrison v. Banque Indosuez*, 6 F. Supp. 2d, 224, 229 (S.D.N.Y. 1998) (dismissing the official capacity Title VII claims against a senior bank officer and supervisor); *Gray v. Shearson Lehman Bros., Inc.*, 947 F. Supp. 132, 135–36 (S.D.N.Y. 1996) (holding that Congress did not permit Title VII suits against individuals in their official capacities); *see also Tomka v. Seiler Corp.*, 66 F.3d 1295, 1313–17 (2d Cir. 1995) ("[I]ndividual defendants with supervisory control over a plaintiff may not be held personally liable under Title VII[.]" . . ."Congress never intended to hold agents individually liable for violations of [Title VII.]"), *abrogated on other grounds*, *Burlington Industries, Inc. v. Ellerth*, 524 U.S. 742 (1998).

Therefore, to the extent that Plaintiff asserts Title VII and ADEA claims against any of the Individual Defendants in their individual and official capacities, the Court dismisses them as a matter of law.

Unlike Title VII and the ADEA, the NYSHRL allows for individual liability under certain circumstances—such as the one here, in which Plaintiffs brought their claims against the

Individual Defendants as "aiders and abettors." The NYSHRL makes it unlawful "for any person to aid, abet, incite, compel, or coerce" acts prohibited by the NYSHRL. *See* N.Y. Exec. Law. § 296(6). Courts have held that an "aider and abettor" is generally "a co-worker who actually participates in the conduct giving rise to a discrimination claim . . . even though that co-worker lacked the authority to either hire or fire the plaintiff." *Feingold v. New York*, 366 F.3d 138, 158 (2d Cir. 2004) (citing *Tomka*, 66 F.3d at 1317). But importantly, aiding and abetting "is only a viable theory where an underlying violation has taken place." *Falchenberg v. N.Y. State Dep't of Educ.*, 338 F. App'x. 11, 14 (2d Cir. 2009).

Accordingly, Plaintiff's NYSHRL claims against the Individual Defendants (Mr. Hough and Ms. Sturans) remain at issue.

## II.   Title VII Discrimination Claims

Under Title VII, it is unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Courts analyze discrimination claims brought under Title VII using the burden-shifting analysis articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Barbini v. First Niagara Bank N.A.*, No. 16 CIV. 7887 (NSR), 2022 WL 623184, at *15 (S.D.N.Y. Mar. 3, 2022)*; Tubo v. Orange Reg'l Med. Ctr.*, No. 13-CV-1495 NSR, 2015 WL 5945853, at *6 (S.D.N.Y. Oct. 13, 2015), *aff'd*, 690 F. App'x. 736 (2d Cir. 2017).

Under the *McDonnell Douglas* framework, the plaintiff must establish a *prima facie* case. 411 U.S. at 802. To establish a *prima facie* case of either gender or age discrimination, a plaintiff must demonstrate that "(1) [he] was within the protected class; (2) [he] was qualified for the position; (3) [he] was subject to an adverse employment action; and (4) the adverse action occurred

under circumstances giving rise to an inference of discrimination." *Liebowitz v. Cornell Univ.*, 584 F.3d 487, 498 (2d Cir. 2009).

The plaintiff's burden at this stage is "minimal" or "de minimis." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 (2d Cir. 2000) (describing burden for discrimination claims); *Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005) (describing burden for retaliation claims). However, a plaintiff must establish all four elements of the *prima facie* case before proceeding with the next step of the *McDonnell Douglas* framework. *See O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311–12 (1996) ("As the very name '*prima facie* case' suggests, there must be at least a logical connection between each element of the *prima facie* case and the illegal discrimination for which it establishes a 'legally mandatory, rebuttable presumption[.]'") (citations omitted).

Once a plaintiff has made a *prima facie* case, the burden shifts to the employer to articulate a "legitimate, nondiscriminatory reason" for the employment action. *McDonnell Douglas*, 411 U.S. at 802. In other words, "[t]he defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507 (1993) (internal quotation marks and emphasis omitted).

Upon the defendant's proffer of a non-discriminatory reason, the presumption of discrimination arising with the *prima facie* case "drops from the picture," *Weinstock*, 224 F.3d at 42 (citing *Hicks*, 509 U.S. at 510–11), and the "final and ultimate burden" then returns to the plaintiff to demonstrate that defendant's reason is in fact a pretext for unlawful discrimination. *See McDonnell Douglas*, 411 U.S. at 804; *Weinstock*, 224 F.3d at 42. The plaintiff must "produce not simply some evidence, but sufficient evidence to support a rational finding that the legitimate, non-

20

discriminatory reasons proffered by the defendant were false, and that more likely than not the discrimination was the real reason for the employment action." *Weinstock*, 224 F.3d at 42 (internal quotation marks omitted) (citation omitted).  Alternatively, a plaintiff may meet its final burden by relying on direct or indirect evidence demonstrating that "an impermissible reason was a motivating factor, without proving that the employer's proffered explanation played no role in its conduct." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 81 (2d Cir. 2001) (internal quotations omitted).  "In short, the question becomes whether the evidence, taken as a whole, supports a sufficient rational inference of discrimination." *Weinstock*, 224 F.3d at 42.

The Second Circuit has "repeatedly expressed the need for caution about granting summary judgment to an employer in a discrimination case where . . . the merits turn on a dispute as to the employer's intent.  At the same time, . . . the salutary purposes of summary judgment-avoiding protracted and harassing trials apply no less to discrimination cases than to other areas of litigation." *Tolbert v. Smith*, 790 F.3d 427, 434 (2d Cir. 2015) (quotation marks, citations, and alterations omitted.)  As in any other case, a plaintiff in an employment discrimination or retaliation case "must 'do more than simply show that there is some metaphysical doubt as to the material facts.' [H]e must come forth with evidence sufficient to allow a reasonable jury to find in her favor." *Brown v. Henderson*, 257 F.3d 246, 252 (2d Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal citations omitted).

For the reasons stated below, the Court GRANTS summary judgment on Plaintiff's Title VII claim.

### A. *Prima Facie* Case of Race or National Origin Discrimination

Defendants argue that Plaintiff fails to establish his *prima facie* case of Title VII discrimination on the basis of race and national origin.  (ECF No. 42 ("Defs.' Br.") at 2–3.)

Defendants aver that Plaintiff fails to establish that he was qualified for his position, that Plaintiff's reassignment of duties and placement into a Performance Improvement Plan do not constitute adverse employment actions, and that there were no adverse employment actions that occurred under circumstances giving rise to an inference of discrimination.  (*See* Defs.' Br. at 3–11.)

For the reasons discussed below, the Court agrees.

> a.  *Qualification for the position*

Defendants argue that Plaintiff was not qualified for his position as Manager of Security of GHVHS, which was the position Plaintiff held before he was terminated.  "Whether job performance [is] satisfactory depends on the employer's criteria for the performance of the job— not the standards that may seem reasonable to [a] jury or judge." *Ochei v. Coler/Goldwater Mem'l Hosp*., 450 F. Supp. 2d 275, 284 (S.D.N.Y. 2006) (citing *Thornley v. Penton Publishing*, 104 F.3d 26, 29 (2d Cir.1997) (plaintiff must establish that she was qualified for the position from which she was discharged by showing that she was satisfactorily performing the job at time); *see also McLee v. Chrysler Corp*., 109 F.3d 130, 135 (2d Cir.1997) (negative evaluations provide legitimate nondiscriminatory reason for termination); *Manko v. Deutsche Bank*, 554 F. Supp. 2d 467, 477 (S.D.N.Y. 2008), *aff'd*, 354 F. App'x 559 (2d Cir. 2009) ("A plaintiff's job performance cannot be assessed in a vacuum; the ultimate inquiry is whether [the] performance 'meets his employer's legitimate expectations. Accordingly, courts routinely rely on evaluations from the plaintiff's supervisors in determining satisfactory job performance.") (citing *Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir.1985)) (internal quotations omitted).

Defendants argue that Plaintiff's Formal Follow-Up memorandum, Verbal Warnings, and PIP provide ample evidence that Plaintiff was not satisfactorily performing his duties. (*See* JAS Aff., Exhs. 23-24, 26, 28-31, 34-35.)  As indicated in those documents, Plaintiff was repeatedly

warned that he needed to improve his job performance by, *inter alia*, timely investigating safety incidences and preparing incident reports, refraining from frequent callouts and improving his attendance, and disciplining security officers.   (*See* Defs.' 56.1 ¶¶ 50, 52, 84, 87, 90-93, 95, 106, 108, 120, 122) *See Ghose v. Century 21, Inc*., 108 F. Supp. 2d 373, 379 (S.D.N.Y. 2000) ("Ghose's tardiness and unsatisfactory attitude, as documented by evidence Ghose has not sufficiently refuted, may reasonably sustain a determination that Ghose was no longer fulfilling normal employment requirements, thereby further supporting his failure to establish a *prima facie* case of discrimination."), *aff'd*, 12 F. App'x 52 (2d Cir. 2001); *Henry v. McDonald*, 531 F. Supp. 3d 573, 585 (E.D.N.Y. 2021) ("Although the Clinic hired Plaintiff, he did not complete his probationary period successfully and repeatedly received negative performance evaluations for the full duration of his employment."); *Weber v. City of New York*, 973 F. Supp.2d 227, 253 (E.D.N.Y. 2013) ("[A] trail of negative performance reviews can serve as evidence that a plaintiff is not qualified for his position.").

Where, as here, an employer presents evidence of unsatisfactory work performance as a legitimate reason for an adverse employment action, a plaintiff must rebut those reasons to survive a summary judgment motion. *Wheeler v. Corp. Couns. of N.Y.C*., No. 93 CIV. 5184 (NRB), 2000 WL 1760947, at *5 (S.D.N.Y. Nov. 30, 2000), *aff'd*, 28 F. App'x 90 (2d Cir. 2002).

Plaintiff contests the veracity of the findings made in the documentary evidence describing Plaintiff's unsatisfactory job performance, and argues the following: (i) that after Mr. Hough requested that Plaintiff communicate with him more, he attempted to do so, but Mr. Hough would slam the door in his face; and that (ii) there was only one security breach that occurred while plaintiff was Security Manager, which he timely reported to Mr. Hough and followed-up on with the Human Resources department.   (*See* Pl.'s Opp. at 11 (citing Pl.'s 56.1 ¶¶ 102, 110, 120)).

Plaintiff relies on his own deposition testimony to rebut the documentary evidence, and he points

to no other corroborating evidence contradicting the findings in the warnings and PIP that Plaintiff

received.  For example, in response to the findings made in the PIP, Plaintiff merely states in his

56.1 Statement that "he did everything required of him to fulfill the requirements of the PIP" (*see*

*e.g.*, Pl.'s 56.1 ¶ 132).  With respect to the September 19, 2019 memorandum documenting points

of job performance improvement, Plaintiff states, "[u]ndisputed that the memo says those words, but

the truth of those words is disputed as [Plaintiff] closed out a majority of his required items."  (Pl.'s

56.1 ¶ 91.)  Because Plaintiff fails to point to evidence on the record corroborating his testimony

and contradicting the documentary evidence on the record, the Court finds that Plaintiff has not

adequately rebutted Defendant's arguments that he was qualified for his position as Manager of

Security of GHVHS.  *See Barbini v. First Niagara Bank N.A.*, No. 16 CIV. 7887 (NSR), 2022 WL

623184, at *16 (S.D.N.Y. Mar. 3, 2022) (plaintiff must "produce not simply some evidence, but

sufficient evidence to support a rational finding that the legitimate, non-discriminatory reasons

proffered by the defendant were false, and that more likely than not the discrimination was the real

reason for the employment action.") (citing *Weinstock*, 224 F.3d at 42); see also *Wheeler*, 2000

WL 1760947, at *7 (Defendants provided detailed record of evidence that plaintiff was sub-par

employee, and plaintiff provided no rebuttal evidence); *Manko*, 554 F. Supp. 2d at 477–78

(Plaintiff failed to rebut Defendant's documentary evidence that she was underperforming.)

Plaintiff also indicates that he significantly reduced grievances and complaints in the

Security Department—but what he cites to does not support that statement, nor does he point to

any other supporting evidence on the record for that fact.  (*See* Pl.'s Opp. at 11 (citing Defs.' 56.1

¶ 42)).  And while Plaintiff argues that he maintained his job qualification for several years, where

he received positive performance evaluations and promotions (*see* Pl.'s Opp. at 11), he does not

address the negative evaluations related to his last position as Manager of Security at GHVHS, where the record indicates that he underperformed and was ultimately terminated.

For these reasons, the Court finds that Plaintiff has not established his *prima facie* showin that he was qualified for his position as Manager of Security at GHVHS.  Putting aside this finding, the Court will also consider whether Plaintiff satisfied the other *prima facie* factors for his discrimination claim.

### b.  *Adverse Employment Action*

"To constitute an adverse employment action in the context of a discrimination claim, and action must cause a materially adverse change in the terms and conditions of employment."  *Henry v. NYC Health & Hosp. Corp.*, 18 F. Supp. 3d 396, 404 (S.D.N.Y. 2014) (internal quotation marks and citation omitted).   A material adverse change in working conditions "must be more disruptive that a mere inconvenience or an alteration of job responsibilities." *Id*. (citing *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008)). Examples of a materially adverse change include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation."  *Id*.

Plaintiff argues that the following constitute adverse employment actions: (i) that Plaintiff's administrative scheduling duties were reassigned to Ms. Kennedy, a Security Assistant; (ii) that Plaintiff was placed on a PIP; and (iii) that Plaintiff was terminated in January 2020.  (Pls.' 56.1 ¶ 60–61; Pl.'s Opp. at 11, 16–17.)

Defendants do not dispute that Plaintiff's termination is an adverse employment action, nor could they do so.  (*See* Defs.' Br. at 8.) *Henry*, 18 F. Supp. 3d 396, 404 (S.D.N.Y. 2014) ("Examples of such a change include termination of employment . . ."); *Fletcher v. ABM Bldg.*

*Value*, 775 F. App'x. 8, 13 (2d Cir. 2019) ("The termination of Fletcher's employment is an adverse employment action").

However, Defendants argue, persuasively, that Plaintiff's placement in a PIP does not constitute an adverse employment action. (*See* Defs.' Br. at 7.) "[I]t is well established that being placed on a performance improvement plan does not constitute an adverse employment action." *Boatright v. U.S. Bancorp*, No. 18-CV-7293 (LJL), 2020 WL 7388661, at *20 n.3 (S.D.N.Y. Dec. 16, 2020), *aff'd*, No. 20-4236-CV, 2022 WL 351059 (2d Cir. Feb. 7, 2022); *Brown v. Am. Golf Corp.*, 99 Fed. App'x. 341, 343 (2d Cir. 2004) (finding an employee's placement on an employment improvement plan insufficient to constitute an adverse employment action); *Gorman v. Covidien*, LLC, 146 F. Supp. 3d 509, 524 (S.D.N.Y. 2015) (same); *McGrath v. Thomson Reuters*, No. 10 Civ. 4944 (JSR) (JCF), 2012 WL 2119112, at *11 (S.D.N.Y. Apr. 30, 2012) (collecting cases for the proposition that "[t]he issuance of a performance improvement plan to an employee is simply not an adverse employment action"), *report and recommendation adopted*, No. 10 Civ. 4944 (JSR) (JCF), 2012 WL 2122325 (S.D.N.Y. June 12, 2012), *aff'd*, 537 Fed. App'x. 1 (2d Cir. 2013) (summary order).

Defendants also argue that the reassignment of administrative scheduling duties from Plaintiff to Ms. Kennedy, a Caucasian woman in her late twenties or thirties, cannot constitute an adverse employment action because the reassignment did not radically change the nature of Plaintiff's work, nor did he receive a demotion or decrease in pay. (*See* Defs.' Opp. at 6–7.) Defendants point out that though administrative scheduling duties were shifted over to Ms. Kennedy, Plaintiff still retained decision-making authority over the schedule and was responsible for reviewing Ms. Kennedy's work. (Defs.' Br. at 6–7; Defs.' 56.1 ¶¶ 64, 73, 94.) Plaintiff, on the other hand, argues that the reassignment is an adverse employment action because it

significantly reduced Plaintiff's material responsibilities, as scheduling had accounted for half of Plaintiff's daily work.  (Pl.'s Opp. at 12; Pl.'s 56.1 ¶ 69.)

"[R]eassignment of job duties is not automatically actionable."  *Saborit v. Harlem Hosptial Ctr. Auxiliary, Inc*., No. 19-CV-4686 (LJL), 2021 WL 2709411, at *18 (S.D.N.Y. July 1, 2021) (citing *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71 (2006)), *appeal dismissed* (Oct. 22, 2021). "Changes in assignments or responsibilities that do not 'radically change' the nature of work are not typically adverse employment actions."  *Saborit*, 2021 WL 2709411, at *18 (citing *Potash v. Fla. Union Free Sch. Dist*., 972 F. Supp. 2d 557, 584 (S.D.N.Y. 2013)).  Here, the Court finds that Plaintiff's reassignment did not radically change the nature of Plaintiff's work, given that he still had supervisory and decision-making authority over the scheduling, nor was the reassignment a demotion.  Rather, it is evident that the task of rescheduling was merely delegated downwards to an assistant, and Plaintiff was given a supervisory role.  *See Joshi v. Trustees of Columbia Univ.* in City of New York, 515 F. Supp. 3d 200, 219 (S.D.N.Y. 2021) (reassignment was not an adverse employment action where there is "no evidence that these duties were inferior or less prestigious than [the plaintiff's] old job duties."). Nor is there any evidence that Plaintiff received less pay. *See, c.f., Torre v. Charter Commc'ns, Inc*., 493 F. Supp. 3d 276, 286 (S.D.N.Y. 2020) ("A plaintiff can show [an adverse employment action] by presenting an employment action that effected the deprivation of some 'tangible job benefits' such as compensation, terms, conditions, or privileges of employment.") (internal quotation and citation omitted).

    *c.  Inferences of Discrimination*

For the reasons stated below, Plaintiff fails to establish an inference of discrimination based on his race/national origin.

"[I]n presenting a *prima facie* case of discriminatory discharge [P]laintiff must present proof that [his] discharge occurred in circumstance giving rise to an inference of discrimination on the basis of [his] membership in [a protected] class." *Johnson v. New York City Dep't of Educ.*, 39 F. Supp. 3d 314, 322 (E.D.N.Y. 2014), *aff'd*, 633 F. App'x 42 (2d Cir. 2016).  To establish an inference of discrimination, a plaintiff may show they were "subjected" "to disparate treatment"— "that is," they were treated "less favorably than a similarly situated employee outside [plaintiff's] protected group." *Bramble v. Moody's Corp.*, No. 19 CIV. 5182 (NSR), 2023 WL 2330475, at *5 (S.D.N.Y. Mar. 2, 2023) (citing *Graham v. Long Island R.R.*, 230 F.3d 34, 39 (2d Cir. 2000)).

Plaintiff argues that circumstantial evidence shows a pattern of disparate treatment by Defendant Hough of older and Hispanic employees. (Pl.'s Opp. at 14.)  Plaintiff offers two unsigned and unsworn affidavits—one from Plaintiff himself and another from Mr. Herb Epps (an black Armed Security Guard), which contain allegations that Defendant Hough treated his white colleagues more favorably than minority colleagues.  (*See* ECF Nos. 48 (Rivera Aff.) and 49 (Epps Aff.)).  No explanation is provided regarding why these affidavits are unsigned and unsworn, and the Court may disregard them as inadmissible.  *Romero v. H.B. Auto. Grp., Inc.*, No. 11 CIV. 386 CM, 2012 WL 1514810, at *2 (S.D.N.Y. May 1, 2012) ("This unsigned affidavit is inadmissible, because it is unsworn and not submitted under penalty of perjury, and I will not consider it."); *United States v. All Right, Title & Interest in Real Prop. & Appurtenances*, 77 F.3d 648, 657–58 (2d Cir.1996) ("[T]he submission of [an] unsworn letter was an inappropriate response to the . . . motion for summary judgment, and the factual assertions made in that letter were properly disregarded by the court.").

The Court notes that Plaintiff cites to Epps's unsigned affidavit to state that Epps, as a black Armed Security Guard "had suffered excessive discipline from Defendant Hough and

through union efforts, was granted backpay and 15 days of paid vacation." (Pl.'s Opp. at 14.) However, the affidavit makes no such statement, and there is no other support for it on the record. (*See generally*, Epps Aff.) Even still, Plaintiff presumably attempts to offer this example to show a pattern of discrimination by Mr. Hough, but this allegation alone is insufficient to establish an inference of discrimination. The Court cannot assume, without more, that there was any racial animus involved in Mr. Epps's employment matter.[3] *See, e.g., Murtha v. New York State Gaming Comm'n*, No. 17 CIV. 10040 (NSR), 2019 WL 4450687, at *8 (S.D.N.Y. Sept. 17, 2019) (the mere fact that one older employee was passed over for a promotion, and another demoted and then fired, over a period of three years, does not establish "a systematic pattern of concerted ill-treatment of older . . . employees intended to encourage their resignation") (citing *Sommersett v. City of New York*, No. 09 Civ. 5916(LTS)(KNF), 2011 WL 2565301, at *7 (S.D.N.Y. June 28, 2011)).

Plaintiff also states, in general terms, that "the experiences shared by older and non-Caucasian employees are enough to support an inference of discrimination." (Pl.'s Opp. at 15.) Plaintiff offers nothing else on the record supporting that statement. Notably, Plaintiff appears to attempt to show an inference of discrimination through a disparate treatment theory—however, such theory fails. Plaintiff does not establish that he was treated differently from similarly situated employees outside of his protected class, as required to show disparate treatment. Plaintiff's blanket statement that he was treated differently than his "younger, white colleagues" without identifying any similarly situated employee is insufficient to satisfy Plaintiff's *prima facie* burden. (*See* Pl.'s Opp. at 14) *McGuinness v. Lincoln Hall*, 263 F.3d 49, 54 (2d Cir. 2001) (holding that, to establish an inference of discrimination, a plaintiff and "similarly situated" employee need not

---

[3]     The Court also notes that allegations that an employer engaged in a pattern of discriminatory conduct are more befit for hostile work environment claims, which is not raised in the Complaint. *See Casarella v. New York State Dep't of Transportation*, No. 16-CV-9531 (NSR), 2020 WL 5849259, at *9 (S.D.N.Y. Oct. 1, 2020).

be identically situated, but rather "similarly situated" in all "material" respects); *see also Marseille v. Mount Sinai Health Sys., Inc.*, No. 18-CV-12136 (VEC), 2021 WL 3475620, at \*5 (S.D.N.Y. Aug. 5, 2021) ("Plaintiff cannot rely on what appears to be nothing more than her own unilateral assumptions about how coworkers outside of her protected classes were treated."), *aff'd sub nom. Marseille v. Mount Sinai Hosp.*, No. 21-2140, 2022 WL 14700981 (2d Cir. Oct. 26, 2022).

Lastly, the Court agrees with Defendants that Plaintiff fails to proffer any other evidence on the record supporting an inference of Title VII discrimination in his employer's decision to terminate him. Crucially, Plaintiff does not allege that any derogatory or discriminatory comment was made about Plaintiff's national origin or race, which undercuts Plaintiff's burden to establish an inference of discrimination. (*See* ECF No. 52 ("Defs.' Reply") at 4.) *See Johnson*, 39 F. Supp. 3d at 322 ("The most significant undisputed fact is Plaintiff's admission that neither individual Defendant ever made a derogatory statement to him about his race.").

Because Plaintiff fails to fulfill his *prima facie* burden of establishing discrimination under Title VII, the Court grants summary judgment on that claim.

## III.   ADEA Discrimination Claim

The Second Circuit applies the *McDonnell Douglas* framework to age discrimination under the ADEA when analyzing claims based on circumstantial evidence. *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 106 (2d Cir.2010). At the *prima facie* stage, Plaintiff must show "(1) that [he] was within the protected age group, (2) that [he] was qualified for the position, (3) that [he] experienced adverse employment action, and (4) that such action occurred under circumstances giving rise to an inference of discrimination." *Id*. Notably, for ADEA claims, Plaintiff must also show that "age was the but-for cause of the challenged adverse employment action and not just a contributing or motivating factor." *Id*.

As discussed above with respect to the Title VII elements, Plaintiff fails to establish that he was qualified for the position, and the only actionable adverse employment action is his termination.  (*See supra*, Part II.A. a. and b.)

Putting those elements aside, and drawing all inferences in Plaintiff's favor, the Court finds that that the record does not contain sufficient evidence upon which a reasonable jury could find an inference of discrimination on the basis of age.

Plaintiff points to two comments made by Defendant Hough in order to try to show an inference of discrimination on the basis of age.  First, Plaintiff points to the fact that in a January 2019 meeting, Defendant Hough directed Plaintiff to "go after" Security Officer James Grimm because "he's older, he is not competent, and he has to go."  (Defs.' 56.1 ¶ 53.)  Second, Plaintiff alleges that in February 2019, Defendant Hough made a comment that he was reassigning the administrative scheduling duties to Ms. Kennedy because Plaintiff "looked tired." (Defs.' 56.1 ¶ 62.)  Plaintiff also argues that he only received positive feedback and performance evaluations until Defendant Hough became his supervisor, "when the feedback and evaluations were exclusively negative until plaintiff's eventual termination." (Pl.'s Opp. at 19.)

The Court agrees with Defendants that none of these allegations establish an inference of discrimination on the basis of age, even when viewing the facts in a light most favorable to Plaintiff.  The Court finds that the stray remark made at the January 2019 meeting regarding Security Officer James Grimm's age fails to create an inference that Plaintiff was terminated in January 2020 from his job as Manager of Security of GHVHS on the basis of his age.  Nor does Defendant Hough's stray remark that Plaintiff "looked tired" in February 2019, before he was ultimately promoted to a higher position in June 2019, indicate that Plaintiff was terminated in January 2020 on account of his age.  *See Barbini v. First Niagara Bank N.A.*, No. 16 CIV. 7887

(NSR), 2022 WL 623184, at *20 (S.D.N.Y. Mar. 3, 2022) ("even if made by decision makers, stray remarks unrelated to the decision behind plaintiff's adverse employment action without more are insufficient to establish a case of employment discrimination.") (citing *Danzer v. Norden Systems, Inc.*, 151 F.3d 50, 56 (2d Cir. 1998) and *Campbell v. Alliance Nat'l Inc.*, 107 F. Supp. 2d 234, 247 (S.D.N.Y. 2000)).

In addition, Plaintiff's allegations that he began receiving negative feedback after Mr. Hough became his supervisor is contradicted by the undisputed facts on the record showing that Mr. Hough provided positive feedback as Plaintiff's supervisor prior to the time in which he was promoted as Manager of Security of GHVHS. (*See* Defs.' 56.1 ¶¶ 27, 28 (Mr. Hough gave Plaintiff a "meets plus" rating in his 2015 and 2016 Performance Appraisal Reports.); *id.* ¶ 48 (describing that Hough gave Plaintiff positive feedback in his 2018 Performance Evaluation). At the same time, the Court notes that Hough's more critical feedback towards Plaintiff began before Plaintiff had made the May 2019 complaint to Ms. Sturans accusing Mr. Hough of age discrimination. (*See* Defs.' 56.1 ¶ 56 (recounting January 2019 meeting where Hough told Plaintiff that "he wanted [Plaintiff] to be a manager instead of part of the boys' club.").

Plaintiff offers no other corroborating evidence on the record supporting his argument that he was terminated on the basis of his age. Therefore, Plaintiff's ADEA discrimination claim must be dismissed. *See Colon v. Trump Int'l Hotel & Tower*, No. 10 CIV 4794 JGK, 2011 WL 6092299, at *8 (S.D.N.Y. Dec. 7, 2011) ("The plaintiff's belief that she has been the victim of age discrimination cannot defeat a motion for summary judgment in the absence of any corroborating evidence.").[4]

---

[4]     It is undisputed that Plaintiff's position was assumed by another individual aged 63-years old, who is within the protected class. *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996) (The discrimination prohibited by the ADEA is discrimination "because of [an] individual's age," though the prohibition is "limited to individuals who are at least 40 years of age") (citing 29 U.S.C. §§ 623(a)(1) and 631(a)). Contrary to what Defendants

IV.    **N.Y. Executive Law § 296 Claims**

   A.  **Employment Discrimination**

Plaintiff also raises analogous race, national origin, and age discrimination under N.Y. Executive Law § 296.  Because it is well established that discrimination claims under the NYSHRL are governed by the same standards as federal claims under Title VII and the ADEA, the same analysis above applies here.  *See supra*; *see also Smith v. New York & Presbyterian Hosp.,* 440 F. Supp. 3d 303, 328 (S.D.N.Y. 2020) ("Both Title VII and NYSHRL discrimination claims are governed by the familiar burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*"); *Pucino v. Verizon Wireless Commc'ns, Inc.*, 618 F.3d 112, 117 n.2 (2d Cir. 2010) ("We review discrimination claims brought under the NYSHRL according to the same standards that we apply to Title VII discrimination claims.); *Lebowitz v. New York City Dep't of Educ.*, 407 F. Supp. 3d 158, 176 (E.D.N.Y. 2017) (articulating same *prima facie* retaliation standard for ADEA and NYSHRL claims.).

Because the Court finds that Plaintiff fails to establish a *prima facie* case for Title VII and ADEA discrimination, the Court also finds that Plaintiff fails to establish his analogous NYSHRL claims.  The Court also dismisses the NYSHRL aiding and abetting claims against the Individual Defendants, as aiding and abetting "is only a viable theory where an underlying violation has taken place." *Falchenberg*, 338 F. App'x. at 14.

---

argue, this does not necessarily mean a lack of age discrimination.  *See id.* at 312 ("The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out because of his age.").  It does, however, undermine an inference of discrimination.  *See, c.f., Colon v. Trump Int'l Hotel & Tower*, No. 10 CIV 4794 JGK, 2011 WL 6092299, at *6 (S.D.N.Y. Dec. 7, 2011) ("Evidence that an employee was replaced by a substantially younger individual or an individual outside the protected class suffices to show circumstances giving rise to an inference of age discrimination. The Second Circuit Court of Appeals has recognized that, in general, "a plaintiff's replacement by a significantly younger person is evidence of age discrimination.") (citing *Carlton v. Mystic Transp., Inc.*, 202 F.3d 129, 135 (2d Cir.2000)).

Therefore, the Court grants Defendants' motion for summary judgment as to Plaintiff's NYSHRL claim.

## V.    Retaliation Claims

As Defendants correctly note, Plaintiff did not raise any retaliation cause of action claim in the Complaint.  (*See* Complaint ¶¶ 47–52.) "[T]he central purpose of a complaint is to provide the defendant with notice of the claims asserted against it."  *Greenidge v. Allstate Ins*. Co., 446 F.3d 356, 361 (2d Cir. 2006).  Courts may also refuse to address merits of claims raised for the first time at the summary judgment stage*. See Rojo v. Deutsche Bank*, 487 F. App'x 586, 588 (2d Cir. 2012) (citing *Greenidge*, 446 F.3d at 361.)

Here, it appears that Plaintiff's counsel, while failing to raise retaliation claims in the causes of action section of the Complaint, does make allegations in the Complaint which describe alleged retaliation.  *See* Complaint ¶¶ 8(b), 9(b), 10(b), 11(b), 12(b) (alleging that each of the Individual Defendants aided and abetted, condoned, ratified and/or directly participated in "retaliation against [Plaintiff] for complaining about unlawful age discrimination and for making complaints to Defendants with respect to GHVHS's violation of applicable laws, rules and/or regulations which endangered the health and safety of ORMC's patients, employees and visitors.").  The 56.1 statements also allude to Plaintiff's allegations of retaliation.  (*See* Defs.' 56.1 ¶ 113 ("Mr. Rivera believed he was placed on the PIP and retaliated against because he reported the inappropriate use of the contractor's access card."); Pl.'s 56.1 ¶ 116 ("Mr. Rivera also believed he was placed on the PIP and retaliated against because he had previously reported that he felt he was a victim of age discrimination of which Hough was fully aware.")  Therefore, even though Plaintiff's counsel failed to properly raise retaliation as a cause of action, the Court will consider retaliation under Title VII, the ADEA, and the NYSHRL.

For the reasons discussed below, the Court finds that Plaintiff fails to assert any retaliation claim under Title VII, the ADEA, and the NYSHRL.  To establish a *prima facie* case of retaliation under Title VII, the ADEA, and the NYSHRL, Plaintiff must show (1) participation in protected activity; (2) Defendants knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and any adverse employment action.  *Hicks v. Baines*, 593 F.3d 159, 164 (2d Cir. 2010); *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996); *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) ("Retaliation claims under Title VII and the ADEA are also analyzed under the *McDonnell Douglas* burden-shifting test . . . ."); *Domingues v. Barton Chevrolet Cadillac*, 2021 WL 637016, *8 (S.D.N.Y. 2021) ("retaliation claims under the NYSHRL are generally governed by the same standards as federal claims under Title VII.").

Plaintiff alleges that the following constitute protected activity: (1) his complaint of age discrimination to Ms. Sturans in May 2019; and (2) his complaint to Ms. Manna about a contractor's inappropriate or unauthorized use of an ID badge on October 31, 2019.  (*See* Pl.'s 56.1 ¶¶ 66–69, 110.)  He also argues that the following constitute adverse employment actions that he suffered as part of Defendants' retaliation: (i) that he was placed in a PIP; and (ii) that he was terminated from his job.  (Pl.'s Opp. at 16.)

"Protected activity is action taken to protest or oppose statutorily prohibited discrimination."  *Natofsky v. City of New York*, 921 F.3d 337, 354 (2d Cir. 2019) (quotation marks omitted).  First, the Court finds that Plaintiff's October 31, 2019 complaint about the contractor's inappropriate or unauthorized use of an ID badge is not a "protected activity" under Title VII, the ADEA, or the NYSHRL.  Plaintiff's complaint to Ms. Manna about the inappropriate or unauthorized use of an ID badge appears to be related to breach of security protocol, but there are

35

no arguments made by Plaintiff, nor is it evident to the Court, that such complaint was made to protest age, national origin, or race discrimination.  Second, the Court finds that neither of the purported "protected activities" pertain to race or national origin discrimination. The May 2019 complaint raised to Ms. Sturans did not allege anything related to race or national origin. Therefore, Plaintiff fails to establish a Title VII retaliation claim or an analogous NYSHRL claim.

Plaintiff's complaint of age discrimination to Ms. Sturans in May 2019 does, however, constitute protected activity for purposes of the ADEA and the NYSHRL (insofar as it relates to age discrimination), but not age or national origin discrimination.

Even still, Plaintiff fails to establish a causal connection between that complaint and any adverse employment action.  As discussed above, Plaintiff's placement in PIP does not constitute an adverse employment action.  (*See supra* II.A.b.).  Plaintiff, moreover, fails to establish a causal connection between his May 2019 complaint about age discrimination and his eventual termination in January 2020. *See Melendez v. Cnty. of Westcheste*r, No. 17-CV-9637 (NSR), 2021 WL 467085, at *11 (S.D.N.Y. Feb. 8, 2021) ("While "temporal proximity can demonstrate a causal nexus .... Where timing is the only basis for a claim of retaliation ... an inference of retaliation does not arise.") (citing *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001), as amended (June 6, 2001)).  As Defendants point out, Plaintiff was promoted to Manager of Security for GHVHS and given a raise in June 2019, which was one month after he complained of age discrimination.  (Pl.'s 56.1 ¶¶ 76–77.)  This subsequent promotion following Plaintiff's May 2019 complaint undermines the causal connection between that complaint and his eventual termination. *See, e.g., Krinsky v. Abrams*, No. 01CV5052(SLT)(LB), 2007 WL 1541369, at *11 (E.D.N.Y. May 25, 2007) ("Plaintiff's retaliation argument is undercut by the fact that, although Plaintiff says he complained in both 1998 and 1999, Defendants rated Plaintiff's overall performance for the 1997-

36

98, 1998-99, and 1999-2000 school years as "satisfactory" . . .   The fact that Plaintiff continued to receive satisfactory evaluations after he allegedly complained of discrimination does not support a causal connection between the protected activity and the adverse employment action."), *aff'd*, 305 F. App'x. 784 (2d Cir. 2009).    Plaintiff points to nothing else on the record that could help him establish a causal connection between his May 2019 complaint of age discrimination and his termination.

Accordingly, Plaintiff's retaliation claims under Title VII, the ADEA, and the NYSHRL are dismissed.

## **CONCLUSION**

For the foregoing reasons, Defendants' summary judgment motion is GRANTED, and Plaintiff's claims are DISMISSED with prejudice as to all Defendants.

The Clerk of the Court is respectfully directed to terminate the motion at ECF No. 41. The Clerk of the Court is also directed to enter judgment for the Defendants.


Dated:    March 21, 2023                                  SO ORDERED:
          White Plains, New York

                                                    _____
                                                          NELSON S. ROMÁN
                                                       United States District Judge